**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**LAURA SMITH,**

     **Plaintiff,**

**vs.**                                          **Case No. 4:06cv496-WS/WCS**

**JACOBS ENGINEERING GROUP, INC.,**

     **Defendant.**

_____/


**REPORT AND RECOMMENDATION
ON
DEFENDANT'S MOTIONS FOR SANCTIONS, DOCS. 68 AND 76**

    This diversity case concerns injuries suffered in a motor vehicle accident by Plaintiff on July 21, 2006.  Defendant is sued for the actions of its driver, who ran into the back of Plaintiff's car.

    Defendant has filed a motion for sanctions concerning Plaintiff's failure to disclose medical treatment for a motor vehicle accident in January, 2000.  Doc. 68.  Plaintiff filed a reply with exhibits, doc. 78, an amended reply, doc. 79 (relying on the exhibits attached to doc. 78), and a supplement, doc. 87.  Defendant filed a reply with leave of court.  Doc. 89.

Defendant then filed a supplemental motion for sanctions for failure to disclose an independent medical examination in November, 2006, by a physician for Geico Insurance Company.  Doc. 76.  Plaintiff filed a reply.  Doc. 83.  Plaintiff's counsel also filed an affidavit.  Doc. 84.  Defendant filed a reply with leave of court, doc. 93, and an exhibit, doc. 94.

Pretrial motions have been referred to me by Judge Stafford.  Doc. 91.  These two pending motions for sanctions will be considered in this report and recommendation.  A report and recommendation is entered because the motions seek a case dispositive sanction.

**Defendant's first motion for sanctions, doc. 68**

Defendant asserts that Plaintiff failed to disclose a January 8, 2000, motor vehicle accident in which she was involved, an accident resulting in neck pain, an ambulance trip to the Tallahassee Memorial Regional Medical Center (TMH),[1] where an x-ray revealed degenerative cervical disc disease.  Defendant represents that as a consequence of the delay, the x-ray can no longer be obtained because it has been destroyed at the hospital.  Defendant asks that, as a sanction, the court instruct the jury "that such x-rays would have shown prior injuries relevant to the claims of the Plaintiff in this action, or, in the alternative," that the court instruct the jury "that the Plaintiff failed to initially disclose the January 8, 2000, MVA until her failure to do so was called to her

---

[1] This hospital formerly was Tallahassee Memorial Hospital and it is still commonly called "TMH."

attention by Jacobs," "or such other relief (including dismissal) available from the Court to remedy her failure."  Doc. 68, p. 2 on the electronic case filing docket (ECF).[2]

### Evidence of record relating to the first motion for sanctions, doc. 68

Defendant's interrogatory 16 asked for the names of all health care providers that treated Plaintiff in the last ten years.  In her March 23, 2007, response, Plaintiff failed to reveal that she had been treated at TMH for a motor vehicle accident in 2000.  Doc. 68, Ex. A, pp. 17 and 31 on ECF.  Plaintiff's March 12, 2007, initial Rule 26 disclosures did not mention this motor vehicle accident either.  *Id.*, Ex. B, pp. 38-42.

Defendant assigned Paul Maluso, M.D., to conduct a Rule 35 independent medical examination (IME) of Plaintiff on August 13, 2007.  *Id.*, pp. 5 and 77.  Dr. Maluso asked Plaintiff whether she had had any problems with her neck before the 2006 accident.  *Id.*, p. 78.  She said: "Slept wrong;" and when asked if there had been any other problems, she said: "No, sir."  *Id.*  She was asked if she had seen any other doctor or had x-rays, and she said no.  *Id.*  Dr. Maluso took x-rays of Plaintiff's cervical spine to assist in his examination.  Doc. 78, Ex. A, p. 18.  The x-rays were after Plaintiff had had cervical surgery.  *Id.*  Dr. Maluso noted: "There is intracervical disk fusion noted at C5-6 with some mild posterior degenerative changes at C6-7."  *Id.*  He also noted from a May 15, 2007, MRI that Plaintiff had "some degenerative bulging at C6-7 level." *Id.*  In the "comments" section, Dr. Maluso said:

> I would like to look at those [emergency room x-rays for the 2006 accident] to see the extent of the degenerative changes in the cervical spine prior to the surgery of Dr. Lee.  Dr. Lee's operative report indicates that the left lateral recess was compressed from bony osteophyte, as well as disk.

---

[2] Hereafter the references to page numbers will be to the page numbers assigned on the electronic document.

> This would indicate that there was some preexisting component to the cervical spine complaints and arm complaints. The degenerative changes would have preexisted the motor vehicle accident.

Doc. 78, Ex. A, p. 18. All of this occurred before Dr. Maluso was provided the hospital records from the 2000 motor vehicle accident.

On August 24, 2007, purely by accident, Defendant obtained medical records of treatment of Plaintiff in 2000 at TMH. Doc. 68, p. 3. Defendant had only asked for the TMH treatment records related to the 2006 accident that gives rise to this suit, but was also provided the records for treatment of Plaintiff in 2000. *Id.* The 2000 records revealed that Plaintiff was involved in a motor vehicle accident on January 8, 2000. *Id.* Plaintiff's vehicle had been rear-ended, she complained of neck pain and right shoulder pain, she was transported by ambulance to TMH on a spine board with her neck immobolized, and an x-ray of her cervical spine revealed "degenerative disc disease seen C6-C7 . . . ." *Id.* Plaintiff's diagnosis on discharge was cervical strain. *Id.*, p. 4. The TMH medical record that Defendant obtained is attached as Composite Ex. C, pp. 57-64. Of particular relevance here, the report of the x-ray taken on January 8, 2000, stated: "COMMENT: There is no fracture or dislocation. Straightening of the normal lordosis. Degenerative disc disease seen at C6-C7 with minor spurring posteriorally on the right of the same level neural foramen." *Id.*, p. 64.

On the afternoon of August 24, 2007, Defendant took the deposition of Dr. Albert Lee, Plaintiff's neurosurgeon, who treated her after the 2006 accident. *Id.* and p. 66. Dr. Lee testified that Plaintiff had told him "specifically that she did not have any symptoms like to the ones that she was complaining of before the accident occurred." *Id.* and p. 68. He said that Plaintiff had not referred to or described for him the motor

vehicle accident that occurred on January 8, 2000.  *Id.*, pp. 5, 68-69.  Dr. Lee was not aware of that prior history.  *Id.* and p. 69.

Dr. Lee said that he doubted "very much" that having the 2000 medical history would have changed his treatment or evaluation of Plaintiff.  Doc. 78, Ex. E, p. 32.  He explained that Plaintiff's symptoms after the 2000 accident were on the right side:

> You did describe to me right-sided upper extremity symptoms and I'm not even sure what bearing that would have on the left-sided symptoms that the patient was complaining about on December 2006.

*Id.*, p. 32.  Dr. Lee said that he found a cervical disc herniation when he reviewed the MRI in 2006.  *Id.*  Since Plaintiff had told him that she had had no symptoms prior to the accident in 2006, Dr. Lee concluded that the cause of the new symptoms was the motor vehicle accident.  *Id.*, p. 33.  The imaging showed that Plaintiff had nerve root compression "from left C5, 6 disc herniation."  *Id.*, p. 34.  Plaintiff's symptoms "consisted of pain radiating down her left arm with numbness and tingling of her left index finger, all of which correlated with left C6 radiculopathy."  *Id.*, p. 35.  This is what Dr. Lee called "C6 distribution."  *Id.*, p. 34.  There was also "a nerve conduction study that confirmed a C6 radiculopathy."  *Id.*, p. 35.

Dr. Lee said that the study after the January, 2000, motor vehicle accident was "a simply cervical spine x-ray."  *Id.*, p. 36.  He said that while that x-ray was not the "best study" from which to draw conclusions, he found that there was "nothing on the 2000 study that suggests that the patient had the problem that I operated on at that time."  *Id.*, p. 36.  He explained that "x-rays are really only good at showing alignments of bone and maybe occasionally showing a bone spur if they happen to be aimed just right," and "do not show any soft tissue anatomy."  *Id.*  Dr. Lee thought that if Plaintiff had had severe

radiating arm pain after the accident in 2000, it would have been a standard practice to obtain an MRI. *Id.*, pp. 36-37.

Plaintiff was deposed on August 27 and 28, 2007. At that time, the 2000 TMH records had been available for three days (over the weekend) and Defendant asked Plaintiff questions about the 2000 motor vehicle accident and the treatment she received. Doc. 78, Ex. M, pp. 77-81. Plaintiff said that she was only "sore and bruised" from that accident. *Id.*, p. 79. She did not recall going to her "regular doctor" for treatment after this accident. *Id.*, p. 80. She could not recall any work restrictions from her doctors after the accident in 2000, and she had no ongoing physical problems resulting from that accident. *Id.*, p. 81.

On August 29, 2007, Plaintiff amended her complaint to allege that she suffered from degenerative disc disease at the time of the 2006 accident. Doc. 29-2, ¶ 8..

Defendant took the deposition of Kirk J. Mauro, M.D., Plaintiff's treating physician, on October 1, 2007. Doc. 68, p. 71. Plaintiff had told Dr. Mauro's Nurse Practitioner that she had not had any prior motor vehicle accidents "requiring ongoing medical care." *Id.*, p. 72. Dr. Mauro interpreted that statement as that Plaintiff "was not having any ongoing medical issues in similar regions of her body that which she was complaining of as related to the events of July 21, '06 . . . ." *Id.* Plaintiff was not asked whether she had had back or neck injuries prior to July 21, 2006. *Id.*, p. 74. She was asked if she had had any motor vehicle accidents requiring ongoing treatment. *Id.* Dr. Mauro did not have in his possession the medical records from 2000, but had recently been given them by counsel for Plaintiff. *Id.*, p. 75. He said that the medical records

from 2000 did not change his impairment rating, which "specifically was based upon the anatomic change and the cervical fusion that was performed by Dr. Albert Lee." *Id.*

Dr. Mauro also testified that an electromyography test (EMG) looks for abnormalities in the nerves and muscles, evaluating "the nerve impulse from the brain to the spinal cord out the nerve root down to the nerves that enter the muscles, resulting in muscle contraction." Doc. 78, Ex. F, p. 41. He said: "It's a very objective test." *Id.*, p. 42. The EMG test for Plaintiff "was all consistent with radiculopathy at a specific nerve root, number C6." *Id.*, p. 43. "Radiculopathy is a pinching of a nerve root that results in either a motor deficit, a sensory deficit, or a reflex deficit, or some combination thereof, which results in symptomatology as expressed by the patient." *Id.*, pp. 43-44. He said if someone had had radiculopathy for years, "you may see atrophy of muscle, which [Plaintiff] did not exhibit." *Id.*, p. 44. Dr. Mauro said that Plaintiff's "EMG needle examination was more consistent with an acute abnormality," that is, "not consistent with someone who had radiculopathy for years." *Id.* By "acute," Dr. Mauro meant "less than six months; chronic would be six months, a year, or greater." *Id.*, p. 45. When asked if a different pattern would be expected if Plaintiff had had radiculopathy from the 2000 motor vehicle accident, Dr. Mauro said:

> Yes. If someone had radiculopathy in excess of six years, clearly the EMG would be of a different pattern. *There is nothing to suggest by this EMG report that [Plaintiff] had this nerve root irritability for any time in excess of six or 12 months.*

*Id.* (emphasis added).

In his deposition on November 28, 2007, after the 2000 accident and records became known, Dr. Maluso said it would have been "helpful" had he known that Plaintiff

had been in a motor vehicle accident in 2000. *Id.*, p. 6 and Ex. G, p. 81. When asked whether a person suffering from degenerative disc might be more likely to suffer a ruptured disc from trauma, Dr. Maluso said yes. Doc. 78, Ex. D, p. 27. There was no follow-up question to explain what "helpful" meant.

On September 24, 2007, Defendant's counsel was advised by the radiology department of TMH that the x-rays from January 9, 2000, were not available, having been "purged." *Id.*, Ex. H, pp. 83-84. The x-rays are kept for only 7 years. *Id.*

If the x-rays were destroyed exactly seven years after originally taken, they would have been destroyed on January 8, 2007. The complaint was filed on October 23, 2006. Doc. 1. Discovery in this case, however, commenced on January 10, 2007, with the initial scheduling order. Doc. 6.

**Proposed findings of fact as to the January, 2000, motor vehicle accident**

Plaintiff was treated for a motor vehicle accident on January 9, 2000. She had injuries to her neck. She was transported in an ambulance using the standard caution of a neck board, and had x-rays at the hospital. The x-rays revealed degenerative disc disease at the C6-C7 level.

The x-rays have been destroyed, but the detailed findings by the radiologist from the x-rays are available. Since the x-rays are destroyed after 7 years on a regular schedule, the x-rays would probably have been destroyed at the time discovery began. Therefore, it is probable that even if Plaintiff had disclosed the existence of these records early on, no one would have been able to obtain the x-rays.

The treatment records from January, 2000, indicate that Plaintiff suffered "cervical strain," which is another way of saying only muscular injury. The x-rays

showed that Plaintiff had preexisting disc degeneration, but there was no obvious disc injury arising from the accident.  The reading of the x-rays by the radiologist revealed that there "was no fracture or dislocation."  In contrast, after the 2006 accident, an MRI showed that Plaintiff had nerve root compression and a disc herniation at left C5-C6, with radiating symptoms (pain, numbness) down Plaintiff's left arm confirmed by EMG studies.  Dr. Lee testified that he doubted "very much" that the history of treatment in 2000 would have changed his treatment or evaluation of Plaintiff.   Dr. Mauro said the radiculopathy that Plaintiff suffered after the accident in 2006 was probably an "acute abnormality," that is, of recent origin, and not connected to the accident in 2000.  Dr. Lee testified that had Plaintiff suffered radiculopathy (radiating arm pain) in 2000, someone would have ordered an MRI, but no MRI was ordered.  Given this evidence, Plaintiff probably had no need for any further treatment after January, 2000.

Plaintiff's failure to reveal the fact of the prior accident and treatment during the many opportunities to do so in discovery is inexcusable.  The evidence would never have been discovered had not TMH disclosed the records inadvertently when Defendant sought the more recent (2006) treatment records.

The failure to disclose the January, 2000, motor vehicle accident was not willful. The medical records from that accident, as reviewed by Drs. Lee and Mauro, lead to the conclusion that Plaintiff did not suffer any lasting injury from that accident and dismissed it from her mind.  Since the evidence was not damaging to Plaintiff's claims, Plaintiff had little motive to fail to disclose this event.  It was, however, gross negligence on Plaintiff's part to fail to reveal this part of her medical history, and that creates doubts about whether she has fully revealed all of her medical and motor vehicle accident history.

As a final note, Defendant should have filed this motion in August, 2007, if it was to be filed at all, when these medical records were accidentally discovered.

**Defendant's supplemental motion for sanctions, doc. 76**

Defendant states that in November, 2006, shortly after the complaint was filed, Plaintiff's insurer, GEICO, arranged for an independent medical examination by Dr. Reginald L. Tall.  Doc. 76, pp. 1-2.  Defendant did not learn of this medical examination until February 22, 2008, when counsel for Plaintiff attached it to Plaintiff's response to Defendant's motion for summary judgment as to punitive damages.  *Id.*, p. 2.  That response is document 69 and the independent examination by Dr. Tall is attached to it as Exhibit A.  The exhibit was attached to document 69 to show that Plaintiff "had been under the continual care of physicians beginning July 21, 2006 and thereafter."  Doc. 69, p. 1.  Plaintiff further stated in her response that:

> Between November 28, 2006 and January 17, 2007 Defendant Jacobs became aware that . . . an independent medical examiner hired by GEICO had opined that her injuries were the result of the motor vehicle accident which is the basis for this action.  See attached Exhibit B.

*Id.*, p. 2.  Plaintiff has not come forward with any evidence to prove this assertion, and Defendant has presented an affidavit of Defendant's insurance adjuster that none of Defendant's agents were aware of this IME.  Doc. 94-2, p. 1.

Exhibit B is a letter to Plaintiff dated November 28, 2006, from Brian A. Broussard, advising Plaintiff that she had:

> reached an end point as to any further future expected positive benefits from continued care within my speciality.  Any further diagnostic testing or chiropractic / Physical Therapy care will not be reasonable, related, or necessary from her 07/21/06 mva.

> Therefore, we are suspending all medical payments for chiropractic /
> Physical Therapy treatment which you received after 12/5/06.

*Id.*, p. 8.  A copy was sent to counsel for Plaintiff and is date stamped received and scanned on November 30, 2006, by counsel for Plaintiff, so it was received by both Plaintiff and her attorney.  Behind the letter is another letter also dated November 28, 2006, to Medical Rehab Secialists [sic] from Mr. Broussard stating that Plaintiff had had an independent medical examination on November 15, 2006, and based on that examination, "we are suspending all medical payments for Chiropractic care treatment which you render after 12/05/06."  *Id.*, p. 9.  This letter indicates that copies were sent to Plaintiff and to counsel for Plaintiff.  *Id.*  Behind that is the November 15, 2006, independent medical examination by Dr. Tall, which was sent to both Plaintiff's counsel and to Plaintiff by one of these letters dated November 28, 2006.  *Id.*, pp. 10-12.

Defendant asserts that Plaintiff had an obligation to disclose the existence of the IME from Dr. Tall.  It should have been identified in response to interrogatory 16, discussed above, on March 23, 2007, and in the first initial disclosures pursuant to Rule 26(a)(1), on March 12, 2007.  Defendant claims Plaintiff was evasive about this IME in her deposition on August 28, 2007.  Defendant notes that Plaintiff did not reveal this IME when her answers to interrogatories were amended on October 5, 2007.  Defendant seeks the sanction of dismissal of all claims, or, in the alternative:

> (i) monetary sanctions, (ii) a jury instruction that through the course of this
> litigation, Plaintiff concealed material facts from defense counsel, (iii) an
> order compelling Plaintiff to truthfully disclose *all* prior automobile
> accidents and *all* medical treatment and examinations relating to this
> accident or any other injury or condition, (iv) an order compelling Plaintiff
> to sit for another deposition related to these topics and to answer all
> questions truthfully, (v) an order granting leave to re-depose Plaintiff's
> medical experts (at Plaintiff's expense) to inquire about the opinions in

light of the newly discovered evidence; (vi) an order continuing the trial to allow Jacobs to fully investigate the circumstances surrounding Dr. Tall's report and examination; and (vii) such other relief deemed appropriate by this Court.

Doc. 76, p. 5 (emphasis in the original).

**Evidence of record as to the supplemental motion for sanctions, doc. 76**

The basic default is not disputed by Plaintiff.  This IME took place on November 15, 2006, but Defendant did not get a copy or learn of its existence until February 22, 2008.  Some of the evidence is discussed above.

Steven Andrews, Esq., counsel for Plaintiff, has filed his affidavit concerning this IME.  Doc. 84. Mr. Andrews states that after April, 2005, his law firm became "paperless."  *Id.*, p. 3.  Mr. Andrews states:

All mail, pleadings, medical records and other documents were scanned into a general electronic file and from there placed into, what is hoped to be, an appropriate subfolder by case and by category.  The categories are as follows:  correspondence, court file, drafts, attorney notes, medical records, and any other subdirectories pertinent to the case.

*Id*.

Mr. Andrews explains that the correspondence from Brian Broussard was placed in the correspondence file for Plaintiff, and not in the medical records file or a separate file for Dr. Tall.  *Id.*, p. 5.  He states that he never saw the IME from Dr. Tall, attached to that correspondence, until February, 2008.  *Id*.

Mr. Andrews states that on about June 7, 2007, a subdirectory under Plaintiff's medical records directory was created for Dr. Tall, M.D.  *Id.*, p. 3.  That directory contains, *inter alia*, medical records requests and inquiries to Jewett Orthopaedic Clinic directed to Dr. Tall, including a response from Jewett Orthopaedic Clinic dated August

7, 2007, indicating that the clinic had no records for Plaintiff.  *Id.*, p. 4.  Counsel states

he was not aware, however, that his office was corresponding with the Jewett

Orthopaedic Clinic in July and August, 2007, until February, 2008.  *Id.*, p. 5.  Mr.

Andrews states that perhaps the Dr. Tall report is not genuine because his office was

told that Dr. Tall had not seen or treated Plaintiff, and the report does not have Dr. Tall's

signature on it.  *Id.*  Counsel concludes: "In any event, the failure to produce the Tall-

IME report was based on a misfiled letter and was not the fault of the client and was not

intentional."  *Id.*

   Attached to the affidavit of Mr. Andrews is a letter dated July 31, 2007, by a

paralegal for his firm to Dr. Tall in Winter Park, Florida, asking for medical records for

Plaintiff for November 15, 2006, the date of the IME.  *Id.*, Ex. C, p. 18 (also filed as Ex.

A to doc. 83).  Attached to this request for medical records is a medical release for

records *for "Reginald L. Tall, M.D.," and it was signed by Plaintiff on July 3, 2007*.  *Id.*, p.

20.  Also attached to this request is a letter from National Solutions & Assessment, Inc.,

Winter Park, Florida, *to Plaintiff at her home address dated October 30, 2006*, with a

copy shown as having been sent to Brian Broussard, Geico Insurance.  *Id.*, p. 19.  *It is

date stamped as "scanned" and "calendared" by Andrews Moye, LLC, on November 1,

2006.  Id*.  The letter schedules a medical examination for Plaintiff at Tallahassee

Physical Therapy Office of Mr. Boldt, 132 Salem Court, Tallahassee, Florida, at 4:00

p.m. on November 15, 2006.  *Id.*  Counsel for Plaintiff states that he "has no idea who

[National Solutions & Assessment, Inc.] is and what relationship it has with Dr. Tall

M.D."  Doc. 83, p. 8 n. 1.

A reply was received by FAX from Jewett Orthopaedic Clinic, P.A., same Winter Park address, on August 7, 2007, stating: "We are not able to find this patient in our system by D.O.B. or S.S.N." *Id.*, Ex. E, p. 25. This reply also contained the original request and a copy of the October 30, 2006, letter received by the law firm of Andrews Moye on November 1, 2006. *Id.*, p. 27.

Notwithstanding this message, a follow-up with a copy of the original request was sent by a paralegal for the firm on August 24, 2007, stating that the firm of Mr. Andrews still had not received a response to the July 31, 2007, request. *Id.*, Ex. C, p. 21; Ex. F, p. 30. It had.

At the deposition of Plaintiff, conducted on August 28, 2007, Plaintiff was asked by counsel for Defendant whether she had seen anyone else for her physical injuries. Doc. 83, p. 3. She said: "Your independent medical examiner." *Id.* She explained:

> There was another medical examiner. I don't recall his name either. I have – I have been to so many doctors and stuff that –

*Id.* She was asked for a name and said she did not recall his name. *Id.* She said she did not believe it was someone she was referred to by Dr. Mauro. *Id.*, p. 4. Mr. Andrews then asked to "go off the record for one second." *Id.* When they returned on the record, counsel for Defendant said "I'm just asking specifically for your physical issues, not for any emotional – ." *Id.* Plaintiff responded: "This was one of those people somebody sent me to for one – one visit." *Id.* Plaintiff thought that the visit was "behind the – in the office buildings behind McDonald's off Magnolia Street."[3] *Id.* Plaintiff said it was a medical doctor. *Id.* She did not believe she had been sent there by either Dr.

---

[3] It is judicially noted that the Salem Court address for the place for the November 15, 2006, IME is in that location.

Mauro or Dr. Lee, but thought it was "one of the insurance companies that are

involved." *Id.*, pp. 4-5.  Mr. Andrews then interjected:

> GEICO, I think GEICO sent her for – somebody sent her for an IME on her
> PIP, I believe.  And that could have been that.  *But I have a vague
> recollection of that.*

*Id.*, p. 5 (emphasis added).

Counsel states in the response to the motion for sanctions that he discovered the

Dr. Tall IME report in his electronic files on February 22, 2008, while preparing for trial.

Doc. 83, p. 8.  Counsel was in Clearwater, Florida, from June 9, 2007, through July 25,

2007, due to a family illness, and reiterates that he was unaware of the correspondence

from his office trying to obtain records from Dr. Tall until February 22-23, 2008.  *Id.*, n. 2.

Counsel admits that he

> most likely saw the letter and report [of Brian Broussard and Dr. Tall] in
> November 2006 prior to the correspondence and attachment being filed
> electronically and it was that "vague recollection" that was offered to
> Defense counsel at the August 2007 deposition of Laura Smith in an effort
> to make sure that all medical records were produced.

*Id.*, p. 9.  Counsel states that "the ultimate test of Plaintiff's good faith is that the Plaintiff

filed the IME in open court [on February 22, 2008], believing it had already been

produced."  *Id.*, p. 14.

Defendant argues that in July, 2007, Plaintiff identified Dr. Tall by name "to a

paralegal in counsel's office."  Doc. 93, p. 3.  Cited for this is document 83, ¶ 3.  The

paragraph cited does not support this assertion of fact.  The evidence does show,

however, that someone in the office of Defendant's counsel had Dr. Tall's name and

typed his name on the release that Plaintiff signed on July 3, 2007, and also knew the

name to generate the request for records letter dated July 31, 2007.

The report of examination by Dr. Tall states that Plaintiff "denies previous history of neck or left shoulder discomfort prior to the injury."  Doc. 69, p. 10.  Dr. Tall found "palpable tenderness in the left trapezial region," with "positive impingement sign, palpable tenderness in the enterior AC joint region" of the left shoulder.  *Id.*, p. 11.  His diagnostic impression was "myofascial syndrome, impingement syndrome, left shoulder."  *Id.*, p. 12.  He said: "In the absence of preexisting traumatic event, I would attribute her neck and should symptoms as a result of the MVA."  *Id.*  He concluded that Plaintiff had reached "therapeutic endpoint from an orthopaedic standpoint," and he said he did not think that Plaintiff needed "additional formalized therapy," "diagnostic imaging studies," or "surgical intervention."  *Id.*  He found that Plaintiff should not have any "restrictions placed on activities of daily living or employment that would be deemed medically appropriate, reasonable or related to the accident in question."  *Id.*

### Proposed findings of fact as to the November 15, 2006, IME

The independent medical examination by Dr. Reginald Tall was partially favorable to Plaintiff in that Dr. Tall thought that "in the absence of preexisting traumatic event," her injuries were the result of the motor vehicle accident in 2006.  Dr. Tall did not have the medical records from TMH with respect to the January 8, 2000, motor vehicle accident.  Still, as discussed above, while that was a "traumatic" event, the records show muscular injury only.  The records do not show lasting injury.

The remainder of Dr. Tall's opinion was unfavorable to Plaintiff's claims.  He said that he did not think that she needed any kind of orthopedic therapy or surgery, and had no residual limitations for daily activities of living or working.

The evidence that Plaintiff herself knew that this independent medical examination existed is conclusive.  It consists of the following:

1.  The examination was scheduled by a letter sent to Plaintiff at her home address on October 30, 2006, scheduling the examination with Reginald Tall, M.D., on November 15, 2006.  Plaintiff's lawyer received this letter on November 1, 2006, scanned it,[4] and put it on his calendar.  Plaintiff went to the examination at 132 Salem Court in Tallahassee and met Dr. Tall.  She spent time with Dr. Tall as she was examined.

2.  Seven months later, on July 3, 2007, Plaintiff was presented a form for release of medical records *from Dr. Tall* and she signed it.  If she had forgotten about this examination by then, this should have refreshed her memory.

3.  About two months later, on August 28, 2007, Plaintiff testified in her deposition that she had been examined by a doctor for an insurance company in the office buildings behind McDonald's off Magnolia Street, which is the location of Salem Court.  She said she could not remember his name.  She should have remembered his name, having signed the release just two months before.

The evidence that counsel for Plaintiff knew that this independent medical examination existed is likewise conclusive.  This evidence consists of the following:

1.  At the deposition on August 28, 2007, counsel for Plaintiff said that he had a recollection that Geico had sent Plaintiff to an independent medical examination.  He

---

[4] The scanned copy received by Plaintiff's counsel has not been produced as such from his electronic files.

admits that his recollection was due to the fact that he probably saw the independent medical examination when it was received by his office in November, 2006.

2. Counsel's office knew that there was an independent medical examination because the examination was put on the office calendar and his office received a copy on November 30, 2006. Counsel's office knew that Dr. Tall conducted the examination because it was put on the calendar and, in July, counsel's office tried to obtain medical records from Dr. Tall, having Plaintiff sign a release for the records. Counsel is charged with what his office knows.

It is accepted that the copy of the independent medical examination was misfiled by counsel's office in correspondence rather than the medical file. Counsel again became aware of it in February, 2008, when he was preparing for trial. When counsel became aware of the IME, he did not immediately give notice to Defendant of the long-standing default in discovery. Instead, counsel attached it to a response to Defendant's summary judgment motion. This was a bizarre thing to do if counsel was trying to withhold the IME from Defendant. While it is *possible* that counsel wanted to make the IME public without having to admit that he had failed to disclose it earlier, I cannot conclude that counsel did this with such intention. It does not fit the evidence. Instead, it is more probable that counsel thought that he had disclosed the IME earlier. This sort of inattention to the details of this case fits more properly with the rest of the evidence. This is especially true since the existence of this IME had been vaguely disclosed in August, during Plaintiff's deposition.

Medical examinations are crucial evidence in a personal injury case. Mishandling a medical examination in a personal injury case is a cardinal sin.

Did Plaintiff or her attorney willfully or maliciously withhold this unfavorable independent medical examination from Defendant?  I recommend that court answer this question in the negative.  The general existence of this medical examination was disclosed to Defendant by both Plaintiff and her attorney at the August 28, 2007, deposition.  It was disclosed vaguely and tentatively, but disclosed nonetheless.  This is entirely inconsistent with any notion that Plaintiff or her counsel willfully withheld the evidence.

Did Plaintiff and her attorney fail to produce this IME through gross negligence?  Assuredly that is so.  The IME went missing and forgotten through a series of negligent acts by Plaintiff, her attorney, and the office of her attorney.  Counsel himself looked at it, but forgot about it until Plaintiff mentioned it at the deposition.  Though "misfiled," the fact of an examination by Dr. Tall was known to Plaintiff and her attorney.  It was also known to counsel's paralegal, who tried to obtain all medical records from Dr. Tall in July and August, 2007.  Dr. Tall's office, of course, did not confirm the fact that Dr. Tall had examined Plaintiff, leading to further confusion, but that is a minor point and not much in favor of Plaintiff.[5]  I will also note that counsel for Plaintiff was unavailable in June and July, 2007, in other civil cases in this court due to a very serious family medical emergency, so his inattention to the actions of his paralegal in those months has an explanation.  Finally, I cannot see why Plaintiff herself did not remember more about this at her deposition.  That, however, is consistent with Plaintiff's failure to tell

---

[5] Dr. Tall's office probably answered those inquiries in the negative because Plaintiff was not a patient of his in Winter Park, Florida, and his examination was a consultative examination in Tallahasseee.

anyone about her January, 2000, motor vehicle accident and treatment for neck injuries at TMH.

**Legal analysis as to both motions for sanctions**

"The decision to dismiss a claim or enter default judgment 'ought to be a last resort-ordered only if *noncompliance with discovery orders* is due to willful or bad faith disregard for those orders.' "  United States v. Certain Real Property Located at Route 1, Bryant, Alabama, 126 F.3d 1314, 1317 (11th Cir. 1997) (emphasis added, case quoted omitted).  The court concluded that the predicate for dismissal pursuant to Rule 37 is violation of a discovery order:

> The government has neither cited nor alleged the existence of decisional law from this circuit upholding Rule 37 sanctions in the absence of a court order compelling discovery.  We question whether a finding of willful, bad faith noncompliance with the government's discovery requests finds support in the record in this case; more importantly, though, the absence of either a motion to compel filed by the government or an order of the court compelling discovery, the violation of which might implicate Rule 37, rendered inappropriate the imposition of the types of sanctions levied here.

126 F.3d at 1317-1318.  *See also* Wouters v. Martin County, Fla., 9 F.3d 924 (11th Cir. 1993), *cert. denied*, 513 U.S. 812 (1994):

> We have consistently held that while district courts have broad powers under the rules to impose sanctions for a party's *failure to abide by court orders*, dismissal is justified only in extreme circumstances and as a last resort.  *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir.) *cert. denied*, 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993); *Ford v. Fogarty Van Lines, Inc.*, 780 F.2d 1582, 1583 (11th Cir.1986); *State Exchange Bank v. Hartline*, 693 F.2d 1350, 1352 (11th Cir.1982).

9 F.3d at 933-934 (emphasis added).

Dismissal is available, however, pursuant to Rule 41(b) for violation of the civil rules.  Gratton v. Great American Communications, 178 F.3d 1373, 1374 (11th

Cir.1999).  "Dismissal under Rule 41(b) is appropriate where there is a clear record of 'willful' contempt and an implicit or explicit finding that lesser sanctions would not suffice."  *Id.*

Further, dismissal is available for a violation of Rule 26(a).  Failure without substantial justification to disclose evidence that should have been disclosed pursuant to Rule 26(a) may be sanctioned pursuant to Rule 37(c)(1).  That Rule provides in part that:  "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial . . . any witness or information not so disclosed."  Additionally, the sanctions authorized by Rule 37(b)(2)(A), (B), and (C) may be imposed, including striking pleadings, dismissing the action, or rendering judgment against the defaulting party.  *Id.*

"Nonetheless, the rule expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless."  Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3rd Cir. 1995).  One court has defined "substantial justification" as "justification to a degree that could satisfy a reasonable person that the parties could differ as to whether the party was required to comply with the disclosure request."  Nyguyen v. IBP, Inc., 162 F.R.D. at 679.  The phrase, therefore, has the same meaning as "substantially justified" for Rule 37(a) purposes.  A motion is "substantially justified" for purposes of Rule 37(a) if "it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.' "  Devaney v. Continental American Insurance Co., 989 F.2d 1154, 1163 (11th Cir. 1993), quoting Pierce v. Underwood, 487

U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (concerning the same

phrase in the Equal Access to Justice Act).  The 1993 Advisory Committee Notes

provide examples of substantial justification:

> While the Rule itself does not specifically delineate the types of non-
> disclosure that are harmless, the advisory notes to the 1993 amendment
> of Rule 37 do provide some guidance as to the type of non-disclosure
> envisioned as harmless:  Limiting the automatic sanction to violations
> "without substantial justification," coupled with the exception for violations
> that are "harmless," is needed to avoid unduly harsh penalties in a variety
> of situations:  e.g., the inadvertent omission from a Rule 26(a)(1)(A)
> disclosure of the names of a potential witness known to all parties; the
> failure to list as a trial witness a person so listed by another party; or the
> lack of knowledge of a pro se litigant of the requirement to make
> disclosures.  In the latter situation, however, exclusion would be proper if
> the requirement for disclosure had been called to the litigant's attention by
> either the court or another party.  Advisory Notes to 1993
> Amend.Fed.R.Civ.P. 37(c).

In re TMI Litigation Case Consol. II, 922 F.Supp. 997, 1003 (M.D. Pa. 1996).

This discovery train wreck is not a pretty picture.  But none of it was maliciously

willful.  Dismissal of Plaintiff's complaint is not warranted.

The court should decline Defendant's invitation to instruct the jury as to Plaintiff's

discovery defaults.  Discovery is designed to get to trial fairly, but the mishaps and

negligence along the way are not especially relevant, as such, to the questions that the

jury will have to decide, and the court should not place any special emphasis upon them

in jury instructions.

There are several other sanctions suggested by Defendant, however, that would

purge the discovery process from its current state of unfairness to Defendant.  The

primary problem is with the IME.  It appears that most of the witnesses were questioned

about the January 8, 2000, motor vehicle accident.  Defendant should be placed in the

position that it would have been had the IME been disclosed in March, 2007, when Plaintiff was required to do so by the Rule 26(a) disclosures and interrogatory 16. However, to the extent that any witness was not previously deposed concerning the January 8, 2000, motor vehicle accident and treatment, Defendant should be allowed to depose such witnesses as to that.  To do this, it is recommended that the following sanctions be imposed upon Plaintiff:

1.   The court should freely allow Defendant to place into evidence the travails it has had with discovery, and should be permitted to argue to the jury that Plaintiff's actions during discovery give rise to a reasonable inference that her memory is selective and her claims are exaggerated.

2.   Discovery reopened for a suitable period of time.

3.   Plaintiff may be deposed again, at Defendant's election, and Plaintiff should be ordered to fully and truthfully disclose every accident, injury, and course of any medical treatment that she has experienced in the ten years prior to the accident at issue in this case.

4.   Defendant should be permitted to depose Dr. Tall and any other witness who has been deposed previously and not questioned about the IME, so that Defendant can question the witness about the November 15, 2006, IME, and, if not repetitive, about the January 8, 2000, accident.[6]

5.   Plaintiff should be required to pay all of Defendant's expenses, including attorney's fees, for the discovery permitted by paragraphs 3 and 4 above.

---

[6] I assume that the disclosure of the IME has not generated any new witnesses that should be deposed other than Dr. Tall.  If that is not so, Defendant may bring it to the attention of Judge Stafford.

6.  Trial in this case should be stayed until Plaintiff has paid the expenses required by paragraph 5.

Accordingly, it is **RECOMMENDED** that the court **DENY** Defendant's motions for sanctions, docs. 68 and 76, to the extent that dismissal of the complaint is sought, but **GRANT** the motions and **ORDER** as Rule 37 sanctions that:

1.  Defendant be permitted to place into evidence at trial these discovery defaults discussed in this report and recommendation and be permitted to argue to the jury reasonable inferences that arise from these defaults concerning Plaintiff's credibility.

2.  Discovery be reopened for a period of 60 days from the date the order adopting this report and recommendation is entered.

3.  Defendant be permitted to depose Plaintiff again and Plaintiff **ORDERED** to fully and truthfully disclose every accident, injury, and course of any medical treatment that she has experienced in the ten years prior to the accident at issue in this case.

4.  Defendant be permitted to depose Dr. Tall and again depose any other witness who has been deposed previously and not questioned about the IME or the January 8, 2000, motor vehicle accident, so that Defendant can question the witness about the November 15, 2006, IME, and, if not repetitive, about the January 8, 2000, accident.

5.  Plaintiff be required to pay all of Defendant's expenses, including attorney's fees, for the discovery permitted by paragraphs 3 and 4 above.

6.  **STAY** trial in this case until Plaintiff has paid the expenses required by paragraph 5.

**IN CHAMBERS** at Tallahassee, Florida, on March 12, 2008.

Case No. 4:96cv496-WS/WCS

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.