**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**LAURA SMITH,**

    **Plaintiff,**

**vs.**                                                                            **Case No. 4:06cv496-WS/WCS**

**JACOBS ENGINEERING GROUP, INC.,**

    **Defendant.**

    _____/

## REPORT AND RECOMMENDATION

Defendant has filed a motion *in limine* to exclude the expert testimony of Farhad Booeshaghi. Doc. 85. Plaintiff has filed a response. Doc. 116.

Plaintiff has retained Dr. Farhad Booeshaghi as an expert to provide an opinion as to the severity of the collision that is the basis for this suit. Defendant contends that Plaintiff failed to serve a sufficient FED. R. CIV. P. 26(a)(2) report. Defendant also contends that the basis and methodology for Dr. Booeshaghi's opinion are insufficient and unreliable, and should be excluded pursuant to FED. R. EVID. 702 and <u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

This is a rear-end collision case.  From a stop, Plaintiff began to move to execute a right turn.  Defendant's vehicle was stopped behind her and probably began to move forward as she did.  Plaintiff's vehicle encountered another vehicle in her path and stopped abruptly.  Defendant's vehicle hit her from behind.  Fundamental to the issue of the forces exerted upon Plaintiff's head and neck in this collision is the speed at which Defendant's vehicle was traveling at impact.  Plaintiff's expert says that the speed was 23 miles per hour, resulting in significant force to Plaintiff's body.

**Rule 26(a)(2)(B)**

Rule 26(a)(2)(B) provides in part that an expert report shall contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) *the data or other information considered by the witness in forming them*;

FED. R. CIV. P. 26(a)(2)(B)(i) and (ii) (emphasis added).  Rule 26(a)(2)(B)(ii) could not be clearer.

Dr. Booeshaghi set forth data in numbered paragraphs in his expert report.  Doc. 85, Ex. A; doc. 85-2, pp. 3-4; pp. 19-20 when viewed on ECF as a consolidated document.  *None* of the data in these paragraphs provides any data having any relevance to an estimate of the speed of Defendant's vehicle at impact.  *Id.*

Dr. Booeshaghi then provided a list of "documents, assumptions, and methodology reviewed as of the date of this report, including *but not limited to*:" *Id.*; p. 5; p. 21 as a consolidated document.  This fails to comply with Rule 26(a)(2)(B)(ii) because it is incomplete.  It equivocates.

The list of topics includes "personal inspection," a deposition of Adam Smith, photographs, a personal interview with Plaintiff, measurement of the two vehicles, "the topography of the accident scene to converge to a distance traveled by the GMC Sierra [Defendant's vehicle] pre-impact," technical information from Expert Autostat and Expert VIN Decoder, and mathematical formulae.[1]  This list also fails to comply with Rule 26(a)(2)(B)(ii) because it is completely without *data*.  The mathematical formulae are not mathematically complicated, but they are driven by numbers.  Numbers were not provided by Dr. Booeshighi.

Rule 37(c)(1) provides the sanction if the expert report is deficient and the deficiency is not harmless:

> These [expert] reports must contain "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2)(B).  Under Rule 37(c)(1) of the Federal Rules of Civil Procedure, a party "that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1).
>
> . . . Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, *see Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir.2000), compliance with the requirements of Rule 26 is not merely aspirational.

---

[1]  For example, Dr. Booeshaghi explains:

Calculated the speed of GMC Sierra [Defendant's vehicle] pre impact utilizing conservation of energy principles, which is a standard physical principle used in accident reconstruction.  It included the mathematical relationship between distance traveled post impact and vehicles' drag coefficients.  The formula used is $v = \sqrt{30 f_1 d_1}$.

Doc. 85-2, p. 4; p. 20 as a consolidated document.

Case No. 4:06cv496-WS/WCS

Cooper v. Southern Co., 390 F.3d 695, 728 (11th Cir. 2004), *cert. denied*, 126 S.Ct. 478 (2005).  It is "within the sound discretion of the trial judge to sanction plaintiffs for their failure to disclose by enforcing the unambiguous terms of Rule 37(c)" if a party fails to comply with the explicit requirements of Rule 26.  *Id.*  "The directives [of Rule 26(a)(2)] are mandatory and self-executing."  Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 59 (1st Cir. 2001).  "Substantial justification" is "justification to a degree that could satisfy a reasonable person that the parties could differ as to whether the party was required to comply with the disclosure request."  Nyguyen v. IBP, Inc., 162 F.R.D. 675, 679 (D. Kan. 1995); Stallworth v. E-Z Serve Convenience Stores, 199 F.R.D. 366, 368 (M.D. Ala. 2001).[2]

The 1993 Advisory Committee Notes provide examples of situations which relieve the defaulting party from this sanction, and is particularly illuminating concerning the issue of harmlessness:

> While the Rule itself does not specifically delineate the types of non-disclosure that are harmless, the advisory notes to the 1993 amendment of Rule 37 do provide some guidance as to the type of non-disclosure envisioned as harmless:  Limiting the automatic sanction to violations "without substantial justification," coupled with the exception for violations that are "harmless," is needed to avoid unduly harsh penalties in a variety of situations:  e.g., the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the names of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures.  In the latter situation, however, exclusion would be proper if

---

[2] The phrase, therefore, has the same meaning as "substantially justified" for Rule 37(a) purposes.  A motion is "substantially justified" for purposes of Rule 37(a) if "it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'"  Devaney v. Continental American Insurance Co., 989 F.2d 1154, 1163 (11th Cir. 1993), *quoting,* Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (concerning the same phrase in the Equal Access to Justice Act).

the requirement for disclosure had been called to the litigant's attention by either the court or another party. Advisory Notes to 1993 Amend.Fed.R.Civ.P. 37(c).

In re TMI Litigation Case Consol. II, 922 F.Supp. at 1003. "A party's misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." Stallworth, 199 F.R.D. at 369.

> "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir.1996). A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir.1998). Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *See Newman v. GHS Osteopathic Inc.*, 60 F.3d 153 (3d Cir.1995) (quoting *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir.1995)); *Cf. $9,041,598.68*, 163 F.3d at 252 (enumerating a similar list of factors to determine whether inclusion of last-minute evidence is harmless); *Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir.1980) (applying these four factors to determine whether the district court abused its discretion in allowing testimony not specified in the pretrial order).

Woodworker's Supply, Inc. v. Principal Mutual Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).

Had Defendant moved for sanctions when this defective expert was served, I would recommend the sanction of exclusion of testimony. But Defendant waited until after discovery closed to seek this sanction, and after Dr. Booeshaghi had been deposed. Defendant had an opportunity to ask Dr. Booeshaghi for the missing numbers. It is better here, therefore, to deny this aspect of Defendant's motion.

**FED. R. EVID. 702 and *Daubert***

Alternatively, Defendant contends that the opinion does not satisfy FED. R. EVID. 702 or the *Daubert* test.  *Id.*, p. 6.  Rule 702 provides that expert opinion is admissible:

> if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

> *Daubert* instructs courts to consider the following factors: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (citing *Daubert*).

Defendant argues that Dr. Booeshaghi's opinion is faulty in two respects.  First, it is argued that the expert determined that Defendant's vehicle accelerated toward Plaintiff's vehicle at .53 G[3] without an adequate basis to do so.  Second, Defendant contends that the expert did not have an adequate basis to determine that Defendant's vehicle traveled 34 feet before it hit Plaintiff's vehicle from the rear.  These, of course, were critical factors in Dr. Booeshaghi's conclusion that Defendant's vehicle was traveling 23 miles per hour when it hit Plaintiff's stopped vehicle.[4]  The speed of

---

[3] 1.0G is the gravitational rate of acceleration of a falling body, 9.8 meters per second per second (an increase of velocity of 9.8 meters per second every second). Presumably .53 G would be an acceleration rate of 5.2 meters per second per second.

[4] The longer a steady rate of acceleration is applied, the faster a body moves.  If the time of acceleration is shorter, the final speed is less.  The time will be shorter if the distance to travel before an abrupt stop is shorter.

Defendant's vehicle on impact with Plaintiff's stopped vehicle is the centerpiece of this litigation.[5]

### Acceleration at .53 G

The acceleration rate used by Dr. Booeshaghi is a presumption. It presumes that Defendant's driver accelerated at that rate.

Defendant contends that Dr. Booeshaghi used an inappropriately fast rate of acceleration of .53 G. Dr. Booeshaghi testified that this acceleration rate came from AutoStat. Doc. 85, p. 9, quoting the deposition, doc. 85-2, p. 10; p. 26 as a consolidated document. He testified:

> There is a specification for that – there are specifications for every vehicle. The one that is widely utilized is called AutoStat. All accident reconstructionists rely on that publication. And AutoStat allows us to get a specification on the performance of a given vehicle.
>
> For this vehicle, the acceleration, the *average* acceleration from zero to 30 is about .53.

*Id.* (emphasis added). Dr. Booeshaghi said:

> It's accelerating under normal conditions. I would correlate it to a starting from zero and going to 30 miles an hour in a testing rate, *not flooring it*, not gradually going, but an average person would travel at that.

*Id.*, p. 17; p. 33 as a consolidated document (emphasis added).

Dr. Booeshaghi said he would "adjust" his opinion as to the speed of Defendant's vehicle if it turned out that the .53 G acceleration rate was the "maximum controlled acceleration" rate. *Id.*, p. 11, quoting deposition, doc. 85-2, p. 20; p. 36 as a consolidated document. Dr. Booeshaghi said that he would "verify" that .53 G "is an

---

[5] "It sets off everything else." Doc. 85, p. 7, quoting Dr. Booeshaghi's deposition, p. 150; doc. 85-2, p. 21; p. 37 as a consolidated document.

average acceleration, but my recollection tells me it is." *Id.*, doc. 85-2, p. 18; p. 34 as a consolidated document. He also said that he did not believe that the numbers reported by AutoStat were "what you can do with that car," like taking a BMW from zero to 60 in a certain amount of time, but he said he would "check into it." *Id.*, p. 20; p. 26 as a consolidated document. He said he would correct his calculations if the .53 G acceleration rate was a maximum acceleration rate. *Id.*

Defendant claims that the AutoStat system's manual provides for "minimum published acceleration *times*," not rates. Doc. 85, p. 10 (emphasis added). Defendant reasons that a minimum acceleration time to reach the top speed, in this case 30 miles per hour, necessarily yields a maximum acceleration rate. *Id.* An excerpt from the AutoStat manual is attached as Exhibit C. Doc. 85-2, p. 25; p. 41 as a consolidated document. The portion of the document is the data definition for "Acceleration, 0->30 mph, 0->60 mph, and 45->65 mph – (PD) – The minimum published acceleration *times*." *Id.* (emphasis added).

Defendant appears to be correct. The website referenced by Defendant[6] provides a PDF copy of the AutoStat Manual for using the computer program. The first thing a user does is to enter the make of the vehicle, year, and body style in question. Manual, page 5. With respect to acceleration and braking data, the Manual states: "This data should be considered as a guide to the *optimum* driver performance." *Id.*, p. 15 (emphasis added). In other words, the data appears to be the fastest acceleration you could get out of that vehicle under "optimum driver performance." Further, the data definition for "Acceleration, 0->30 mph" is the "minimum published acceleration times,"

---

[6] http://www.4n6xprt.com/asman.pdf .

as shown by Defendant by its exhibit.  *Id.*, p. 10.  One of the data definitions is for a "real" data field for an item in the software named "0-30 (feet/second/second)."  *Id.*, p. 16.  This would appear to provide an acceleration rate based upon the minimum time that the particular vehicle can accelerate to 30 miles per hour from a stop, again the "optimum driver performance."  Thus, it would produce the maximum acceleration rate for the particular vehicle, not the average acceleration rate.

Plaintiff responds that Dr. Booeshaghi has acquired an "acceleration performance meter" and would like to jointly test Defendant's vehicle, since very few GMC Sierras exist with a 4.8 LV 8 Cylinder Overhead Valve Engine, but Defendant has refused.  Doc. 116, p. 7.  Plaintiff also offers a reduced calculation using an assumed acceleration rate that is 50% less than .53 G, and this results in a final speed of 16 miles per hour, but still would have produced significant G forces on Plaintiff's head and neck.  *Id.*, p. 8.

Neither salvages this expert report.  There must be an adequate basis for an opinion with regard to the presumed acceleration rate of Defendant's vehicle for the opinion to be presented to the jury.  Rule 702 requires that an expert opinion be "based upon sufficient facts or data."  *Daubert* requires that the opinion be based upon a "technique [that] is generally accepted in the scientific community."  It is doubtful that use of a maximum or optimum acceleration rate is "generally accepted" in the accident reconstruction community to calculate the speed at impact in a rear-end collision of the type before this court because it presumes that all drivers accelerate from a dead stop at all times at the highest rate technically possible in the vehicle.  Further, Dr.

Booeshaghi said he was not sure about .53 G being an average acceleration rate, and Defendant has shown that it is not.

Of course, if the evidence supported the theory that Defendant's driver floored it, leaving smoke and rubber as he accelerated toward the accident with Plaintiff, then the .53 G acceleration would be perfectly proper.[7] Plaintiff makes this argument, relying upon the driver's bad traffic record. Doc. 116, p. 13. The problem here is that the court is left without confidence that Dr. Booeshaghi had an adequate understanding of the meaning of the acceleration rate he chose. If indeed he intended to presume Defendant's driver was an average driver, who accelerated into this accident at an average rate of acceleration, then it appears he used the wrong number and his opinion is flawed and would confuse a jury.

Plaintiff argues that Dr. Booeshaghi has much experience and training in accident reconstruction. The problem, however, is not with the expert's expertise, but with the faulty data that is the basis for his opinion.[8]

In summary, this objection to the opinion of Dr. Booeshaghi has merit. The motion in limine should be granted as to this issue. Dr. Booeshaghi should not be permitted to testify to the speed of Defendant's vehicle at impact because he has not

---

[7] I can imagine a case where witnesses saw Defendant's driver floor it, accelerating at a high rate of speed, leaving rubber and smoke, and where analysis of the damage to the vehicles suggested the expenditure of force consistent with a speed of 23 miles per hour. In such a case, it might be perfectly proper to rely upon the maximum acceleration rate as being consistent with the other evidence. That can of evidence has not been argued here.

[8] Thus, Wilson v. Woods, 163 F.3d 935 (5th Cir. 1999), cited by Plaintiff, has no application here. "That case dealt strictly with the qualifications, or lack thereof, of the proposed expert in accident reconstruction." Holloman v. State, 820 So. 2d 52, 56 (Miss. 2002). Dr. Booeshaghi's credentials as an expert are not challenged.

Case No. 4:06cv496-WS/WCS

established the reliability of the basis for the presumed acceleration rate that he has relied upon.

**A distance of 34 feet from start to impact**

Defendant quotes from the deposition of Dr. Booeshaghi where he explained how he determined that the distance traveled was 34 feet and argues that "[n]othing about this opinion is scientific or technical."  Doc. 85, p. 13.  "This likewise lacks any scientific or technical basis," argues Defendant, as to other explanations.  *Id.*  Defendant argues that Dr. Booeshaghi "provides no scientific basis for this distance because there is none." *Id.*, p. 14.  Defendant argues that "Booeshaghi's speculation is not scientific evidence."  *Id.*  Defendant argues: "At bottom, [Dr.] Booeshaghi needed a distance to input into his formula, and he invented one."  *Id.*

This objection is unpersuasive.  Of course it is true that Dr. Booeshaghi needed a distance to calculate the estimated speed.  The estimated distance is simply a matter of garden-variety evidence and ultimately will be determined by the jury.[9]  An expert reviews the evidentiary possibilities, assumes that certain things are true based upon his own review of the evidence, and puts that data into his expert formulae.  That's what experts do.  This objection is not a basis to exclude the opinion of Dr. Booeshaghi as to the speed Defendant's vehicle was traveling when it hit Plaintiff's vehicle.

---

[9] The distance will require a determination of where the two vehicles were in that turn lane to begin with, how far apart they were at the beginning, and where Plaintiff's vehicle was on impact.  That distance will be determined by the jury by the testimony of Plaintiff, Adam Smith, the accident report and diagrams that might be attached to it, a view of the turn lane, surveillance of the traffic in the turn lane to see how traffic normally flows through it, and a tape measure.  This is not "scientific" evidence.

Accordingly, it is **RECOMMENDED** that Defendant's motion *in limine*, to exclude the expert opinion of Dr. Farhad Booeshaghi, doc. 85, be **GRANTED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 18, 2008.

s/ William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**